IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| BRYAN A. MOORE, | CASE NO. 3:23-CV-00979-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Bryan Moore challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On May 15, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated May 15, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Moore filed for SSI on May 7, 2021, alleging a disability onset date of April 16, 2016. (Tr. 198). The claims were denied initially and on reconsideration. (Tr. 60-72). Mr. Moore then requested a hearing before an Administrative Law Judge. (Tr. 103-05). Mr. Moore (represented by counsel) and a vocational expert (VE) testified on March 24, 2022. (Tr. 35-58). On March 30, 2022, the ALJ determined Mr. Moore was not disabled. (Tr. 18-37). The Appeals Council denied

Mr. Moore's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Moore timely filed this action on May 15, 2023. (ECF #1).

Factual Background

### I.      Personal and Vocational Evidence

Mr. Moore was 39 years old on the alleged onset date and 45 years old at the administrative hearing. (Tr. 41, 60). He graduated from high school, received specialized training in welding, sheet metal, and HVAC services, and previously worked at a fast-food restaurant. (Tr. 213-14).

### II.      Relevant Medical Evidence

On February 17, 2021, Mr. Moore established care with Joy Barnes, M.D. (Tr. 345). There, he described a medical history significant for alcoholism and tobacco use, drinking around twelve beers and smoking one to two packs per day. (*Id*.). He endorsed additional stressors including a limited support system. (*Id*.). He also reported chronic back pain with associated morning back stiffness and chronic intermittent hip pain with stiffness and limited range of motion. (Tr. 345-46). Physical examination revealed elevated blood pressure and decreased range of motion and deformity in the hands with multiple contractures on multiple fingers; otherwise, examination was normal. (Tr. 348). Dr. Barnes noted Mr. Moore was inattentive with slow behavior and a depressed mood. (Tr. 349). Cognition, thought content, and memory were normal. (*Id*.). Dr. Barnes prescribed lisinopril to reduce blood pressure, ordered image testing, recommended over-the-counter pain relievers for back pain, advised range of motion exercise to prevent further contractures, and strongly encouraged alcohol and tobacco cessation. (Tr. 350).

2

Left hip X-rays from February 4, 2021 showed minimal spurring of the superior acetabulum without fracture or dislocation. (Tr. 399). Lumbar X-rays showed age-indeterminate but chronic appearing mild anterior wedge compression deformities at T12 and L1, scattered osteophytes and minor facet arthropathy. (*Id.*). Hand X-rays revealed chronic fracture deformity of the distal 4th and 5th metacarpals on the right. (*Id.*). Mr. Moore could not straighten the 3rd, 4th, or 5th digits of his right hand or the 5th digit of his left hand. (*Id.*).

On February 22, 2021, Mr. Moore received EMS transport to the emergency department for ongoing back pain. (Tr. 273). Treatment notes indicate he walked down two flights of stairs to the EMS truck without difficulty and ambulated without difficulty in the emergency department. (Tr. 273, 275). Examination was normal. (Tr. 274-75). A lumbar X-ray revealed a compression deformity at T12 and L1 of unknown age without subluxation. (Tr. 275). Mr. Moore reported significant pain relief with Tylenol, Motrin, Zanaflex, and a Lidoderm patch, and complete resolution of symptoms with Norco. (*Id.*). He was diagnosed with chronic midline low back pain without sciatica and discharged in stable condition. (Tr. 276).

On February 24, 2021, Mr. Moore presented to the emergency department with chronic back and left-sided hip pain. (Tr. 268). He reported drinking ten beers daily and drank at least seven beers that evening to ease the pain. (*Id.*). Treatment notes indicate Mr. Moore ambulated independently and displayed full range of motion in his legs and hip. (*Id.*). Examination revealed tenderness at the left hip and the thoracic and lumbar spine with full range of motion. (Tr. 270). He was prescribed Valium and Toradol for pain and recommended to see an orthopedist for management of his back pain. (*Id.*).

Later that morning, Mr. Moore spoke with Dr. Barnes on the telephone to discuss imaging results and his continued pain. (Tr. 337). Dr. Barnes advised Mr. Moore to go through detox but he refused. (*Id.*). She recommended consulting with an orthopedic surgeon for evaluation of his spine and hands, prescribed folic acid, and reiterated the importance of detox. (*Id.*).

On March 3, 2021, Mr. Moore returned to the emergency department and reported ankle pain after falling on his right leg two days before. (Tr. 492; *see also* Tr. 494). Nursing notes indicate Mr. Moore smelled as if he had not bathed in several days and he was dirty. (Tr. 494). Examination revealed mild lumbosacral paraspinal muscular tenderness, bruising on his lower legs, ecchymosis over the right ankle, and foot and ankle tenderness. (Tr. 496). A foot X-ray revealed a mildly distracted avulsion fracture at the lateral anterior talus with mild overlying soft tissue swelling. (Tr. 512). Mr. Moore left before consulting with orthopedics. (*Id.*). He was diagnosed a right talar avulsion fracture, provided a walking boot and crutches, and advised to follow up with orthopedics. (*Id.*).

On March 4, 2021, Mr. Moore met with Dr. Barnes for follow up for back pain and right foot pain. (Tr. 326). He reported the compression fracture was likely old. (*Id.*). He also reported scheduling an appointment with an orthopedic surgeon for an evaluation of his hands but did not schedule the MRI. (*Id.*). He reported cutting his drinking by half because he was trying to get a job. (*Id.*). Dr. Barnes continued to encourage detox, referred him to pain management for his back pain, and prescribed a muscle relaxer to be used "very sparingly." (Tr. 329).

On March 10, 2021, Mr. Moore met with orthopedist Richard Merton Miller, D.O., for hand pain. (Tr. 367-68). He described a history of punching with his right hand and reported contracture but denied numbness and tingling. (Tr. 368). During physical examination, Mr.

Moore could make a loose composite fist with his right hand. (Tr. 370). Dr. Miller noted fixed

flexion deformities of the 3rd, 4th, and 5th fingers on the right hand and less severe deformities of

the 3rd and 4th fingers on the left hand, significant large Dupuytren's cords to the small and ring

fingers bilaterally, and without motor, sensory, or vascular deficits. (*Id.*). X-rays of Mr. Moore's

right hand showed a well-healed malunion deformity of the 5th finger. (*Id.*). Dr. Miller discussed

treatment options for Dupuytren's contracture, including oral anti-inflammatories, bracing,

injections, imaging, activity modification, physical therapy, and surgical intervention, and advised

Mr. Moore to keep his scheduled appointment with Dr. Skie. (*Id.*).

Thoracic and lumbar spine MRIs from April 13, 2021 showed the following:

- chronic appearing inferior endplate compression fracture of L1 with 40% height loss and T12 with 60% height loss;

- chronic superior endplate compression fracture of T6 with 30% height loss, T7 with 30% height loss, and T8 with 50% height loss;

- posterior disc protrusion at T8-T9 that indents the anterior spinal cord; and

- central disc protrusion, moderate bilateral facet arthropathy, moderate canal stenosis, and mild bilateral neural foraminal narrowing at L4-L5.

(Tr. 389).

On April 15, 2021, Mr. Moore met with Dr. Barnes to discuss the MRI findings. (Tr. 361-

63). There, he reported persistent back pain, described as stabbing and shooting, in the lumbar

and thoracic spine that radiates to his thighs, knees, and feet. (Tr. 363). He has associated stiffness

and numbness. (*Id.*). The pain is aggravated by bending and lying down. (*Id.*). Physical examination

was normal except Mr. Moore had difficulty with lumbar range of motion testing in all directions,

tenderness over the thoracic and spinous processes, and bony tenderness. (Tr. 365). Dr. Barnes

discussed the importance of reducing alcohol intake and scheduling appointments with pain

management to discuss injections for short-term relief and a neurosurgeon to discuss surgical options for his back pain. (Tr. 366). Dr. Barnes also continued prescriptions for lisinopril, vitamin B1 supplements, and folic acid, prescribed gabapentin for back pain, and recommended a bone density scan. (*Id.*).

On April 28, 2021, Mr. Moore met with pain management specialist Muhammad Hefzy, M.D., for evaluation. (Tr. 359). There, he complained of constant thoracic, lumbar, and sacroiliac pain, described as shooting and stabbing and aggravated by bending, lying down, and walking. (Tr. 359-60). He reported radiating pain to his left knee and thigh and associated weakness. (Tr. 360). After reviewing diagnostic imaging, Dr. Hefzy assessed chronic bilateral thoracic back pain, lumbosacral spondylosis without myelopathy, and chronic bilateral low back pain. (Tr. 362). He recommended diagnostic bilateral lumbar facet injections at L3-L4, L4-L5, and L5-S1 and, if the pain is mediated, would consider radiofrequency ablation of the nerves in those areas. (*Id.*).

On June 4, 2021, Mr. Moore received bilateral lumbar facet nerve block injections. (Tr. 528-29).

On July 17, 2021, Mr. Moore presented at the emergency department and complained of difficulty urinating for four days and pain in his back and left hip. (Tr. 1481). An abdominal CT scan revealed wall thickening of the bladder, hepatic steatosis, compression deformity of T12 and large inferior Schmorl's node of L1, and a possible inclusion cyst at the left inguinal region. (Tr. 537). He was diagnosed with hematuria, hypokalemia, and leukocytosis, received an antibiotic, and was discharged in stable condition. (Tr. 1484, 1487).

On August 2, 2021, Mr. Moore arrived at the emergency department and complained of nausea, vomiting, difficulty urinating, and groin swelling for two weeks. (Tr. 569). He was

6

diagnosed with Fournier's gangrene [1] and underwent urgent emergency surgery for debridement and drainage. (Tr. 573). The necrotic tissue extended deep into the scrotum, involving the urethra. (Tr. 572). The surgery team debrided the necrotic tissue and removed a large cyst lodged in the left inguinal canal. (*Id.*). The surgeons also placed a suprapubic catheter. (Tr. 581). Mr. Moore was transferred to the intensive care unit (ICU) in critical condition and placed on mechanical ventilation. (Tr. 581, 595). The ICU staff assessed Mr. Moore after surgery and noted acute respiratory failure, Fournier's gangrene, a urinary tract infection, septic shock secondary to gangrene, lactic acidosis, acute kidney injury, thrombocytopenia, metabolic derangements, and hyperglycemia. (Tr. 595).

On August 6, 2021, Mr. Moore underwent a second surgical debridement. (Tr. 1333). He was extubated the following day. (Tr. 1090). On August 16, 2021, Mr. Moore underwent a third surgical debridement and washout. (Tr. 1261-62). For wound care, the treatment team prescribed negative pressure wound therapy and provided Mr. Moore with a wound vacuum, a device that removes pressure over the area of the wound. (Tr. 1291; *see also* Johns Hopkins Medicine, *Vacuum-Assisted Closure of a Wound,* http://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/vacuumassisted-closure-of-a-wound (last accessed Apr. 1, 2024)). On August 20, 2021, Mr. Moore was discharged at his insistence after hospital staff arranged for home health care services to change his wound vacuum and administer antibiotics. (Tr. 1333).

---

[1] Fournier's gangrene, a type of necrotizing fasciitis, is a life-threatening bacterial infection of the scrotum, penis, or perineum that destroys soft tissues, including muscles, nerves, and arteries. Cleveland Clinic, *Fournier's Gangrene,* http://my.clevelandclinic.org/health/diseases/22025-fourniers-gangrene (last accessed Apr. 1, 2024).

On August 30, 2021, Mr. Moore presented at the wound clinic and reported his wound vacuum fell off on August 27 and he did not have home health care. (Tr. 893). Vascular surgeon Brett Aplin, M.D., observed no signs of infection or necrotic tissue. (*Id.*). The wound clinic would contact home health care services for assessment and to reapply the wound vacuum. (Tr. 895-96). Dr. Aplin referred Mr. Moore to urology for management of his suprapubic catheter. (Tr. 896).

On September 10, 2021, Mr. Moore met with a nurse practitioner at the infectious disease outpatient clinic for follow-up. (Tr. 888). He reported compliance with antibiotic therapy and that he was awaiting replacement of the wound vacuum. (Tr. 889). He endorsed groin pain and decreased wound drainage. (*Id.*).That same day, the wound clinic informed Mr. Moore he must come to the clinic three times a week for wound care because it could not find home health care services due to staffing and insurance issues. (Tr. 892). Mr. Moore declined and said he did not want the wound vacuum at this time. (*Id.*).

During a September 14, 2021 office visit with Felix Boecker, M.D., Mr. Moore reported constant pain. (Tr. 884). He returned to the wound clinic on October 5, 2021, where physical examination revealed leg swelling with pitting edema and he appeared ill. (Tr. 1457). The nurse described the wound as improving and instructed Mr. Moore on the importance of daily wound care and dressing changes. (Tr. 1458-59).

On October 15, 2021, Mr. Moore returned to Dr. Hefzy's office with continued back pain radiating to his thighs, knees, and feet that is aggravated by position, standing, sitting, twisting, and bending. (Tr. 1465). He described associated symptoms including numbness, tingling, and weakness. (*Id.*). Dr. Hefzy recommended Mr. Moore consult with the surgical team to discuss

options but noted intervention must wait until his Fournier's gangrene wound was resolved. (Tr. 1468).

### III.    Medical Opinions

On April 15, 2021, Dr. Barnes completed an impairment questionnaire about Mr. Moore's back pain and functional abilities. (Tr. 304-08). Dr. Barnes opined that Mr. Moore can perform work in a seated position for less than one hour in eight-hour day and perform a job standing and/or walking for less than one hour in an eight-hour workday, must avoid continuous sitting and get up from a seated position ten to twelve times an hour, and can occasionally lift and carry up to ten pounds. (Tr. 306). In an average workday, Mr. Moore's pain and fatigue will rarely interfere with his attention and concentration, but he will likely be absent more than three times a month. (Tr. 307). According to Dr. Barnes, Mr. Moore's symptoms and limitations date back to January 2016. (Tr. 308).

On June 9, 2021, State agency medical consultant Leon Hughes, M.D., reviewed Mr. Moore's medical records and determined he can lift and carry twenty pounds occasionally, ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, and scaffolds; and frequently use the right arm to handle and finger. On September 20, 2021, State agency medical consultant Lynne Torello, M.D., noted Mr. Moore appeared to be recovering from a bout of Fournier's gangrene and determined the updated evidence did not support additional limitations. (Tr. 70).

On January 27, 2022, Garmia Methi, M.D., completed a pain assessment related to Mr. Moore's back pain, Fournier's gangrene, and hand contractures. (Tr. 1471). Dr. Methi described

Mr. Moore's pain as stabbing, shooting, cramping, and achy with associated numbness and tingling; present all the time; precipitated by prolonged sitting, standing or walking, twisting, and bending; and aggravated with changing positions with twisting and bending. (Tr. 1472). Dr. Methi opined that Mr. Moore can perform work in a seated position for two hours in an eight-hour workday; perform a job standing and/or walking for two hours in an eight-hour workday; must avoid continuous sitting and must move around for five to ten minutes each hour; can occasionally lift up to ten pounds; and can rarely or never reach, handle, or finger due to bilateral hand contractures. (Tr. 1475-76). Dr. Methi also determined Mr. Moore's pain would frequently interfere with his attention and concentration, cause him to be absent from work more than three times a month, and necessitates hourly five-to-ten-minute breaks. (Tr. 1476-77).

## IV.    Administrative Hearing

At the administrative hearing, Mr. Moore testified he cannot work due to pain. (Tr. 42). He cannot walk a full city block, bend at the waist, or squat. (*Id.*). He can sit for about 15 to 20 minutes before needing to move. (Tr. 43). He sleeps about two hours a night and naps during the day. (Tr. 44). He has constant lower and middle back pain that radiates to his legs and is aggravated by strenuous activity. (Tr. 47). He receives spinal injections that provide temporary relief for a few days. (Tr. 48). Mr. Moore's hands are painful and deformed; he cannot straighten some of his fingers, which causes him to drop things from his grasp. (*Id.*). He cannot open jars and sometimes needs help with buttons and zippers. (Tr. 49). He has constant residual pain from the groin surgeries and was scheduled for reconstructive surgery and removal of the suprapubic catheter. (*Id.*). Some days are worse than others and Mr. Moore self-medicates using marijuana.

10

(Tr. 51). Mr. Moore can shower on his own, use the microwave to make his own meals, and do a few chores around the house, such as doing dishes and taking the trash out. (Tr. 45).

The VE testified that a person of Mr. Moore's age, education, and experience, with the functional limitations described in the ALJ's residual functional capacity (RFC) determination, could perform jobs including marker, housekeeping cleaner, and cashier II. (Tr. 52-53). The VE also stated employers tolerate off-task behavior up to 10% of the workday and one to two absences per month but not on a consistent basis. (Tr. 56). A person requiring an unscheduled 10-minute break every hour cannot maintain competitive employment. (Tr. 57).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

11

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Moore had not engaged in substantial gainful activity since May 6, 2021, the application date. (Tr. 23). At Step Two, the ALJ identified the following severe impairments: disorders of the skeletal spine with pain and without sciatica; osteoarthritis; history of bilateral hand fractures/right hand small finger malunion/bilateral hand contractures with multiple finger flexion deformities; and status-post Fournier gangrene and septic shock. (*Id.*).

At Step Three, the ALJ found Mr. Moore does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*). Specifically, the ALJ considered Listings 1.15 and 1.16 (both relating to spine disorders) and found Mr. Moore did not meet either because he did not require the use of an assistive device. (Tr. 23).

The ALJ determined Mr. Moore's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: Postural limitations of occasional climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Frequent stooping, kneeling, crouching, and crawling. Frequent use of the bilateral lower extremities for operation

12

of foot controls. Manipulative limitations of frequent use of the right upper extremity for handling, and fingering.

(Tr. 24-25).

At Step Four, the ALJ found Mr. Moore does not have past relevant work. (Tr. 30). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Moore can perform, including marker, housekeeping cleaner, and cashier II. (Tr. 31). Therefore, the ALJ found Mr. Moore was not disabled. (Tr. 32).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Mr. Moore brings two issues for review. *First*, he claims the ALJ did not properly evaluate the medical opinions. (ECF #6 at PageID 1810). As part of this argument, he states the ALJ relied on "select normal medical findings," argues the medical evidence is "wholly consistent" with his treating providers' opinions, and claims the State agency medical consultants' opinions are grossly inadequate. (*Id.* at PageID 1810-12). Additionally, Mr. Moore notes the State agency medical consultants' opinions predate his Fournier's gangrene diagnosis and treatment such that the medical consultants "did not consider an extensive portion of the record that directly contradicts their conclusions." (*Id.* at PageID 812). *Second*, Mr. Moore argues the ALJ did not evaluate his symptoms in accordance with the regulations, including Social Security Ruling 16-3p. (*Id.* at PageID 1813). He alleges the ALJ invoked boilerplate language and summarized some of the evidence but did not provide any reasons for discounting his statements about the severity of his symptoms. (*Id.* at PageID 1815). The Commissioner responds that the ALJ applied the correct legal standards and identified substantial evidence to support his conclusions. (ECF #7 at PageID 1826, 1835).

**Evaluation of Medical Opinions**

Because Mr. Moore filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 416.1920c. Under these revised regulations, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 416.920c(b). The regulations eliminated the hierarchy of medical source opinions that previously gave preference to treating source opinions.

15

The ALJ need not to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. *Id.* at § 416.920c(a). An ALJ must explain how he considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. § 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ failed to consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

Here, the ALJ analyzed all the medical opinions as follows:

The claimant was evaluated by State agency medical consultants at the initial and reconsideration level of review. For the initial review, Leon Hughes, M.D., opined that the claimant was limited to light exertional work except occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; and frequent handling and fingering with the right upper extremity. Upon reconsideration, Lynne Torello, M.D., adopted the initial residual functional capacity assessment. These opinions were mostly persuasive as the evidence supported a limitation to light exertional work due to lumbar and thoracic compression deformities and degenerative changes as well as frequent handling and fingering with the right upper extremity due to hand contractures and malunion of

16

the small finger on the right hand. However, due to reports of intermittent leg pain, the undersigned further limited the claimant to frequent use of the bilateral lower extremities for operation of foot controls.

Joy Barnes, M.D., the claimant's primary care physician, completed an impairment questionnaire on April 15, 2021. Dr. Barnes opined that the claimant could sit less than one hour in an eight-hour workday; he could stand and/or walk less than one hour in an eight-hour workday; and the claimant must get up from a seated position to move around 10 to 12 times per hour for 10 minutes each time. The doctor further stated that the claimant could occasionally lift and/or carry 10 pounds, and never lift or carry anything over 10 pounds. Dr. Barnes stated the claimant had no significant limitations in reaching, handling, and fingering. She said that the claimant would rarely have symptoms that would interfere with attention and concentration, but the claimant would likely be absent from work more than three days per month due to his impairments or treatment.

This opinion is not very persuasive because the extreme limitations such as sitting, standing, walking, and breaks were not consistent with the overall record. While the claimant did have limited lumbar range of motion when examined by Dr. Barnes, multiple examinations by various physicians found the claimant had full or normal range of motion despite lumbar and thoracic tenderness and pain. Examinations also determined the claimant had full lower extremity strength, no motor weakness, no sensory deficits, no focal deficits, no saddle anesthesia, full (5 out of 5) strength, and full range of motion of the legs and hips. Imaging studies of his pelvis/sacroiliac joints, left hip, and left knee were normal. Even during periods of pain exacerbation when he went to emergency departments, it was noted that he was "able to walk down two flights of stairs . . . without any difficulty" and he was ambulating independently and without difficulty. These objective examinations do not support the extreme limitations outlined in the doctor's opinion. The claimant's limitations were accounted for in the residual functional capacity assessment herein by limiting him to light work with additional postural and manipulative limitations. Additionally, the opinion that the claimant needed twelve 10-minute breaks per hour is not even possible as there are only 60 minutes in one hour, not 120 minutes that would be needed in the doctor's opinion. This further reduces the persuasiveness of the opinion.

Garima Methi, M.D., completed a pain assessment questionnaire on January 27, 2022. Dr. Methi opined that the claimant could sit for two hours total during an eight-hour workday and could stand and/or walk for two hours total in an eight-hour workday. The doctor said it was medically necessary that the claimant avoid continuous sitting for an eight-hour workday; he would need unscheduled breaks each hour for five to ten minutes each; and he would be absent more than three times per month due to his impairments. Dr. Methi further opined that the claimant could occasionally light and/or carry up to 10 pounds; he could never/rarely grasp,

turn, and twist objects, use hands/fingers for fine manipulation, or use his arms for reaching including overhead due to bilateral hand contracting. The doctor noted that the date of the most recent exam was on January 26, 2022, but that exam was not included with the opinion.

This opinion was not persuasive as the extreme limitations were not consistent with the overall record. As stated above, the extreme standing, walking, and sitting limitations were not supported by the multiple other exams that found the claimant had no motor weakness, no sensory deficits, no focal deficits, no saddle anesthesia, full (5 out of 5) strength, full range of motion of the legs and hips, normal imaging studies of his pelvic/sacroiliac joints, left hip, and left knee, and the ability to during back pain exacerbations to walk down two flights of stairs without difficulty and to ambulate independently and without difficulty. Moreover, examination of the hands by an orthopedic surgeon did not support Dr. Methi's extreme bilateral upper extremity limitations. The orthopedic surgeon did find fixed flexion deformities of the small and middle fingers of the right hand with Dupuytren's contracture, but he was able to make a loose fist with the right hand, and motor, sensory, and vascular examination of the bilateral upper extremities were grossly intact without focal deficits. The claimant's limitations were addressed with postural and manipulative limitations such as frequent use of the right upper extremity for handling and fingering.

(Tr. 29-30) (citations omitted) (cleaned up).

The ALJ's decision articulated how he considered the consistency and supportability of Mr. Moore's treating providers. As it relates to the consistency of Dr. Barnes's opinion, the ALJ acknowledged Mr. Moore's occasional tenderness and limited range of motion on examination and compared that finding with physical examinations across the record showing full range of motion, full extremity strength, no weakness, and no focal deficits. (Tr. 29). The ALJ also noted Mr. Moore ambulated without difficulty down two flights of steps despite his pain. (*Id.*). As to supportability, the ALJ determined the normal imaging studies of Mr. Moore's pelvis, sacroiliac joints, left hip, and left knee did not support Dr. Barnes's opinions regarding sitting, standing, walking, and unscheduled breaks. (*Id.*). The ALJ adequately explained his reasoning for finding Dr. Barnes's opinions less persuasive and that explanation is sufficient to guide this Court's review.

Moreover, substantial evidence in the form of normal objective medical findings support the ALJ's determination, including normal musculoskeletal range of motion, full motor strength, full sensation, and normal coordination.

As to Dr. Methi's opinion, the ALJ again cited normal objective medical findings and Mr. Moore's observed ability to walk down two flights of steps without difficulty despite alleged pain as evidence of the inconsistency of Dr. Methi's opinions with the other evidence of record. (Tr. 30). As with Dr. Barnes's opinion, the ALJ noted the normal pelvic, sacroiliac joint, left hip, and left knee diagnostic imaging did not support Dr. Methi's opinions regarding standing, walking, and sitting limitations. (*Id.*). Finally, the ALJ determined the orthopedic surgeon's hand examination that revealed Mr. Moore's ability to make a loose fist did not support Dr. Methi's opinion that he could never or rarely use his upper extremities for handling, fingering, or reaching overhead due to bilateral contractures. (*Id.*). But while the ALJ disagreed with Dr. Methi's handling and fingering limitations, the ALJ recognized some degree of limitation and determined Mr. Moore could frequently perform such tasks. (Tr. 25). The ALJ adequately explained his reasoning for finding Dr. Methi's opinions less persuasive and that explanation is sufficient to guide this Court's review. Moreover, substantial evidence in the form of normal or mildly atypical objective medical findings support the ALJ's determination.

Mr. Moore argues the ALJ erred by disregarded the treating providers' detailed explanations for their opinions, Dr. Barnes and Dr. Methi's opinions are wholly consistent with the medical evidence, the State agency medical consultants' opinions are "grossly inadequate" and wholly inconsistent with the treating providers' opinions and medical records. (ECF #6 at PageID 1810-11). Contrary to Mr. Moore's conclusory assertions, the ALJ actively engaged with the

19

explanations from his treating providers, determined the evidence was not consistent with or supported by the medical evidence of record, and offered reasons to support his findings on their persuasive value.

Mr. Moore's claim that the ALJ disregarded the MRI showing old spinal compression fractures is not supported by the record. Elsewhere in the decision, the ALJ addressed that MRI and noted Mr. Moore was referred to a neurosurgeon to discuss potential treatment but also considered the lack of record evidence suggesting Mr. Moore followed up with any neurosurgeon. (Tr. 27). The ALJ also noted that Mr. Moore did not attend physical therapy after his pain management doctor referred him. (*Id.*). As such, I find the ALJ did not disregard without reason or fail to address any relevant medical evidence. Mr. Moore's argument amounts to a request to reweigh the evidence, something this Court cannot do. It bears repeating that a district court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard,* 889 F.2d at 681. Even if this court determined substantial evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d 477.

Mr. Moore also notes the State agency medical consultants' opinions predated the diagnosis and treatment of Fournier's gangrene and therefore "did not consider an extensive portion of the record that directly contradicts their conclusions." (ECF # 6 at PageID 1812). Mr. Moore does not expand on this argument or otherwise indicate how Mr. Moore's treatment for an infection and wound care contradicts the State agency medical consultants' opinions. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most

skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Without more effort at developed argument, I deem this argument waived. Although Mr. Moore appears to have a difficult and, as of the administrative hearing, incomplete recovery from this infection, he did not provide evidence of functional impairment sufficient to satisfy the disability standard. *See Jones,* 336 F.3d at 474 (the claimant bears the burden of proving the existence and severity of limitations caused by his impairments).

Because the ALJ applied the correct legal standards and substantial evidence supports his conclusions, I recommend the Court decline to remand on this basis.

**Evaluation of Symptoms and Compliance with SSR 16-3p**

In his second argument, Mr. Moore claims the ALJ failed to provide a sufficient explanation for discounting his symptoms. (ECF #6 at PageID 1815).

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. § 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* at § 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* at § 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.,* No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which

21

the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* In other words, the RFC assessment is based on the evidence of record and the ALJ's evaluation of the consistency of the claimant's statements regarding symptoms, *i.e.*, the SSR 16-3p analysis.

SSR 16-3p outlines a two-step process an ALJ is to follow when evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.152I)(3) and 416.929(c)(3) to evaluate the individual's statements:

1.  A claimant's daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, at *5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. § 416.929(c)(2); *see also* SSR 16-3p, at *6.

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p, at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in

23

the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). In reviewing an ALJ's evaluation of an individual's symptoms, the Court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones,* 336 F.3d at 476.

Here, the ALJ identified Mr. Moore's hearing testimony and evaluated his statements as follows:

> The claimant, a 45-year-old, alleged disability due to chronic back pain, multiple bones in back fractured, right-hand problems, broken right hand, 15 fractured vertebrae, and three compound fractures. At the hearing the claimant testified that pain throughout the majority of his body prevents him from working fulltime. He stated that daily, constant pain in his back, which radiates in the lower extremities, prevents his ability to walk, stand, lift, and sit for extended periods. For a little over a year, the claimant said he has been unable to walk a full city block, stand for 10 minutes at one time, or bend at the waist. He stated that about one year ago, his doctor placed him on lifting restrictions of no more than five pounds, and about one month ago, a different doctor placed him on the same restrictions. The claimant stated that he could sit for more than 15 to 20 minutes at one time before he needed to change positions due to pain. He smokes about a half a pack of cigarettes per day, he last drank alcohol about six weeks ago, and he last used marijuana about three days ago. He does not currently participate in a substance abuse program. He stated that he uses marijuana to self-medicate as he does not take other medication for pain. The claimant testified that he recently had his first pain management injection, and he is scheduled for another about one week after the hearing. He said that the injection helped for a little while before the pain returned. The claimant stated that he also has daily pain hand pain due to past fractures and deformities. He explained that he is unable to straighten his fingers, so he drops things every day. The claimant said he uses both hands to drink, he has difficulty with buttoning and zipping for which he sometimes needs help from others, and he is unable to open jars such as a pickle jar.

> Additionally, the claimant testified that he was scheduled the following Monday to have his urethra put back together as he is currently not urinating properly. He does

not have a colostomy bag, but he said he wears adult briefs. He stated he has daily constant pain in his groin due to this. The claimant testified that if he was lucky, he got about two hours of sleep per night; he naps during the day for about four to six hours total. He is cable of showering/bathing, he can prepare microwave meals, and he can perform very few household chores. He explained that any chores involving lifting or standing such as taking out to the trash or doing dishes he is unable to do.

\* \* \*

In sum, the undersigned has carefully considered the claimant's statements concerning his impairments and their impact on the ability to perform work activity and finds the allegations are somewhat inconsistent with the other medical evidence of record. This is not to say that the claimant was symptom free or did not experience difficulty performing some tasks. However, the record as a whole does not demonstrate the existence of limitations of such severity as to have precluded him from performing all work on a regular and continuing basis at any time from the alleged onset of disability. The onset, nature, intensity, and duration of symptoms, as well as precipitating and aggravating factors, have all been factored into the residual functional capacity assessment set forth herein for this claimant. Consequently, the specified residual functional capacity is consistent with the functional limitations that can be expected from the nature and extent of the claimant's medically determinable impairments, based upon the totality of evidence of record.

(Tr. 25, 30) (citations omitted). Considered on its own, the ALJ's explanation says little about the consistency between Mr. Moore's statements about the intensity and persistence of his symptoms and the objective medical evidence. Indeed, the ALJ claims to have considered all required factors without explaining how Mr. Moore's statements were inconsistent with those factors, or even identifying what evidence supports his determination that Mr. Moore's statements are "somewhat inconsistent" with other evidence of the record.

But elsewhere in the decision, the ALJ commented that Mr. Moore's statements were inconsistent with the evidence of record, including his abilities to ambulate without difficulty, examinations revealing some atypical but largely normal range of motion findings, his repeated failures to follow up on referrals to specialized doctors despite being counseled on the importance

25

of doing so, his failure to complete diagnostic testing and pick up prescribed medication, and his refusal to enter treatment for his alcohol use despite the necessity to do so before pain management could prescribe opioids for pain control. (Tr. 26-27). The regulations allow an ALJ to find inconsistency when a claimant does not seek or attend treatment that may provide relief. When evaluating whether symptom intensity and persistence affect an individual's ability to perform work-related activities, the ALJ will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed. SSR 16-3p, at *9. Persistent attempts to obtain relief of symptoms may indicate the individual's symptoms are a source of distress and that they are intense and persistent; on the other hand, the alleged intensity and persistence of symptoms may be inconsistent with overall evidence of the record if the frequency or extent of treatment sought is not comparable with the degree of subjective complaints or if the individual fails to follow prescribed treatment that might improve symptoms. *Id.*

Although the paragraph indicating Mr. Moore's statements about the intensity and persistence of his symptoms are "somewhat inconsistent" provides little more than an unsupported conclusion, the decision as a whole – which emphasizes his numerous failures to follow through with referrals, medication use, and treatment – makes clear why the ALJ reached that conclusion, and it is supported by substantial evidence. As such, I find no reason to overturn the ALJ's symptom evaluation.

Because the ALJ applied the correct legal standards and his decision is supported by substantial evidence, I recommend the District Court **AFFIRM** the ALJ's decision.

26

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: April 4, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).